UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTO SMITH,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

Case No. 04-CV-73740

HONORABLE STEVEN D. PEPE

## OPINION AND ORDER

### I.   BACKGROUND

Arto Smith brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  Both parties have filed motions for summary judgment, and have consented to the undersigned's jurisdiction pursuant to 28 U.S.C. § 636(c).  For the following reasons, IT IS ORDERED that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment be GRANTED IN PART and the case remanded for further administrative proceedings.

    A. PROCEDURAL HISTORY

Plaintiff applied for DIB on May 21, 2002, alleging that he was disabled as of October 24, 2001, because of a herniated disc following a car accident and skin cancer (R.. 56, 67).  After Plaintiff's application was initially denied, he had a June 7, 2004, hearing before administrative law judge (ALJ) Robert T. Karmgard who issued a decision on June 25, 2004, finding Plaintiff to be disabled.  (R. 12).  On August 27, 2004, the Appeals Council denied Plaintiff's request for

review.  (R. 4).

### B. BACKGROUND FACTS

#### 1. PLAINTIFF'S HEARING TESTIMONY

At his hearing on June 7, 2004, Plaintiff stated that he normally sleeps and watches television during the day and that he is not able to help around the house in any way (vacuuming, shopping, making small repairs).  (R. 246 - 50).  He is unable to participate in hobbies nor is he able to 'do anything with' or 'for' his two children anymore.  (R. 247 - 48).  Because of Plaintiff's pain medication (Vicodin) he spends the majority of his day sleeping or lying down and is always tired.  (R. 248).  Despite this constant fatigue, Plaintiff "never get[s] a full night's sleep."  (R. 32).  Generally, the only things that Plaintiff says he is able to do when he is not lying down is watch TV and read the newspaper.  (R. 249).  He also indicated that he will sometimes go to the grocery store and he visits his mother-in-law on the weekends.  (R. 247, 250).

Plaintiff stated that he is unable to do his job as a truck driver because of problems with his ankles, back, wrists and nose.  (R. 240).  Specifically, Plaintiff could no longer tie down and bind his truck loads nor climb the ladders as his job required.  (R. 241).  Plaintiff describes the pain in his back as "very sore" and that the pain is "there all the time, but what sets it off is – a lot when I move around, you know, when I sit down.  If I'm laying down, it'll seem like I can – it can be more – it feels better for me."  (R. 251).  When asked how long he could sit, Plaintiff was not responsive although ALJ Karmgard seemed to suggest five minutes because when he immediately inquired about standing he asked: "Would that also be about five minutes or so."  (R. 252).  Plaintiff responded: "Just a couple minutes," noting that his back becomes a problem

for him as soon as he stands up and that walking is difficult for him unless he is able to lean on something (like a supermarket cart) and even then he will need to stop frequently. (R. 253). Plaintiff says his injured nose (which he says was broken in the accident) makes it difficult for him to breathe. The Plaintiff says that his legs are tired and sore and that his left knee is "swelling up." (R. 254). Plaintiff suffers from a hurt left shoulder that he believes he injured as a result of "just sleeping on that side." (R. 254 - 56). When asked further about his shoulder, the Plaintiff said that he could not lift either of his arms to shoulder level or above his chest. (R. 256). When asked how much he could lift, the Plaintiff said that he could "not lift anything right now, probably a bag with some paper towel in it," but not ever as much as 10 pounds. (R. 257).

The Plaintiff said that his skin cancer has "cleared up" and that he still wears a back brace. (R. 32).

### 2. MEDICAL EVIDENCE

Following Plaintiff's October 24, 2001, automobile accident, where he was hit from the side, he was treated for contusions and muscle strains in the emergency room of Harper Hospital. Plaintiff reported a scratched eye, some pain in the left scapula area, pain in the lower part of his back, and pain in the left ankle. (R. 106). On examination, Plaintiff's eyes were puffy and erythematous but his extraocular movements were intact and there were no further abnormalities. (R. 107). Examination of the Plaintiff's ears, nose, mouth, and throat, along with his nervous, respiratory and cardiovascular systems showed no abnormalities and were operating normally. (Id.). Plaintiff had a normal range of motion of the arms and legs with some pain on movement of the left ankle (Id.). Plaintiff underwent x-rays of the left ribs and left ankle which showed no osseous destruction. The x-rays of the left ribs and left ankle showed no fractures and mild soft

tissue swelling of the ankle (R. 102, 104, 108).  Plaintiff was sent home with pain (Vicodin) and anti-inflammatory (Naprosyn) medication (R. 108).

Records of Dr. Bronstein, which are partly illegible, show that on November 13, 2001, Plaintiff complained of pain in his lower back that often radiated into his legs (R. 112, 140). EMG/NCV testing on that date revealed evidence of early L5-S1 radiculopathy (R. 112, 140). The doctor indicated that Plaintiff would benefit from manual therapy and stretching exercises. (R. 112, 140).

On December 2, 2001, an MRI of the lumbar spine, ordered by Dr. David S. Eilender, showed a spur and disc combination eccentric to the left at L5-S1 with encroachment upon the epidural space.  There also appeared to be some spur on the right at L5-S1 without any encroachment upon the associated structures.  There was no evidence of infection as well as no evidence of a tumor.  (R. 139, 192).

Following the Plaintiff's visit to Harper Hospital's emergency room, he was apparently treated by Dr. Bronstein.  In December and January, his doctor indicated that he could return to work, but was restricted to a sitting job because he continued to have severe pain.  (R. 115, 118, 120).

On January 7, 2002, Plaintiff told Dr. Beale, an orthopedic surgeon, that he had been treated by Dr. Richard Brown and underwent physical therapy three times a week with moderate relief (R. 109).  He complained of some numbness in his right leg down to the calf, which was worse with standing too long.  On examination, Plaintiff was in obvious distress, tender in his lower back, decreased range of motion and positive straight leg raising, and decreased sensation at S1 on the right.  The impression was a ruptured disc at L5-S1, degenerative arthritis, and

sciatica. Dr. Beale recommended a neurological evaluation for possible surgery, noting that the Plaintiff's size is a deterrent. He stated that Plaintiff was "disabled from constant repetitive bending, lifting, twisting, turning, pushing, or pulling." (R. 109).

Dr. Beale completed a series of forms and indicated that Plaintiff was "totally disabled" by a herniated disc and/or sciatica in the period from January 2001 through November 2003 (R. 138, 144, 147, 149, 155, 156, 202-08, 211-18, 220-22, 224; see R. 198-201). On April 28, 2003, and October 8, 2003, Dr. Beale wrote short letters to Plaintiff's insurance carrier indicating that Plaintiff was "presently totally disabled" and "totally and permanently disabled, and unable to participate in any vocational or advocational [sic] activities in this time" as a result of the motor vehicle accident (R. 219, 223).

On March 8, 2002, Dr. Adolfo L. Melicor examined Plaintiff's left shoulder and determined that the Plaintiff had possible Calcific Tendinitis noting: "There are soft tissue calcifications near the greater tuberosity consistent with calcific tendinitis. The left shoulder is otherwise unremarkable." (R. 124).

Dr. Robert E.M. Ho, a neurosurgeon, saw Plaintiff on March 28, 2002, on referral from Dr. Beale (R. 187-89). Plaintiff described his pain as constant and quite severe, stating that the pain is a '7' on a scale of 1 - 10. (R. 187). Plaintiff suffered from pain in the lower back which radiated to his left leg. He initially had pain in both legs, but the right leg pain had resolved. He had tingling paresthesias in his left leg at the time of his visit and had pain radiating to the left posterior thigh and lower leg upon straight leg raising. There was decreased pin prick sensation in the left lower extremity, but motor function and reflex activity were intact. (R. 187, 188). Dr. Ho noted that the December 2001 MRI of the lumbar spine showed broad based disc herniation

5

and a spur eccentric to the left at L5-S1 with encroachment on the epidural space and that associated spurring was also present on the right at L5-S1 without any encroachment on the associated structures. (R. 188). The November 2001, EMG of the lower extremities showed evidence of L5 and S1 radiculopathy. Plaintiff's functional impairments were restricted bending, lifting, and twisting (R. 189). Dr. Ho wanted more diagnostic testing prior to recommending surgery in order to evaluate for a disc rupture, spinal stenosis or collapse of the intervertebral disc space. (R. 189). Plaintiff agreed to proceed.

On April 16, 2002, Plaintiff had another EMG/NCV which revealed no electrophysiologic evidence of lumbosacral radiculopathy, plexopathy, myopathy, or polyneuropathy affecting the left lower extremity. (R. 133). The needle EMG and the remainder of the nerve conduction studies were normal.

Plaintiff returned to see Dr. Ho in May 2002, and reported improvement of the left leg pain and that his pain was currently in the lower back and occasionally down into the hip area. Even with occasional radiation into the leg, Plaintiff was not considered a surgical candidate. (R. 151). Plaintiff stated that he could control his pain with medication and agreed he no longer needed surgery. The neurological examination showed decreased pin prick in areas of the left lower extremity, but was otherwise normal. Plaintiff's functional impairment continued to restrict bending, lifting, and twisting. (R. 152). Dr. Ho found that Plaintiff had a spontaneous remission in his symptoms, which correlates with improvement in his EMG. He prescribed Tylenol No. 3 to be taken as needed with no refills.

On July 9, 2002, Cynthia Shelby-Lane, M.D., performed a consultative internal medicine examination at the request of the state agency (R. 157-64). Plaintiff reported that he took

Tylenol No. 3 four times a day. (R. 157). He also reported that he sustained a "closed head injury with some facial abrasions but no loss of consciousness." (R. 157). Plaintiff claimed that both Dr. Beale and Dr. Ho had recommended surgery, but said that he had declined it due to complications related to this sort of problem. (R. 157). On examination, Plaintiff had minimal paralumbar and low thoracic back discomfort (R. 160). A review of Plaintiff's system showed everything to be normal except for his head which was positive for a closed head injury with some facial abrasions and his injury to his back. (R. 158, 159). There was no paravertebral muscle spasm, no muscle wasting, and no spinal deformity. Reflexes were normal, as was straight leg raising. Gross and fine motor skills were normal, as was grip strength. Plaintiff had a normal gait and stance, could perform tandem walking, but had difficulty walking on his heels and toes. He could squat and bend only 40 percent of the normal distance. Range of motion was also normal in the spine, shoulders, elbows, and hips (R. 162-63). The neurological exam was normal with a steady gait (R. 160).

On August 23, 2002, Dr. Beale wrote an orthopedic report regarding his treatment of Plaintiff (R. 173-74). An examination showed that the Plaintiff's movements were slow and guarded and that the range of motion in the lumbar spine was constricted by 50 degrees and tenderness was present along the lumbar spine at L5 and S1. Straight leg raising was to 45 degree bilaterally. There was no atrophy. His findings indicated sciatica and herniated lumbar disc. (R. 173). He continued to treat Plaintiff conservatively on a monthly basis recommending "management over diagnostic testing to see if there is a problem that can be treated with surgery." (R. 174). He was treated with Tylenol No. 3 and physical therapy, and his condition remained unchanged. Dr. Beale last saw Plaintiff on August 3, 2002. He stated that Plaintiff

was restricted from prolonged standing and walking; constant and repetitive bending, twisting, and stooping; and lifting heavy objects. He then stated that Plaintiff was "unable to perform any vocational or advocational [sic] activities." Dr. Beale thought that Plaintiff might need surgery in the near future. He also stated that there was no change in the patient's condition and that he believed the condition was permanent and that Plaintiff was "totally and permanently disabled and entitled to social security disability benefits." (R. 174).

On May 18, 2004, Dr. Beale wrote another "To Whom It May Concern" letter with nearly identical examination findings to his letter of August 2002 (R. 225-26). In the May 2004 letter Dr. Beale noted that a myelogram and surgery were recommended for Plaintiff, but he refused the procedures, although he did undergo epidural injections (R. 225). He continued to treat Plaintiff with Vicodin, and his restrictions remained the same ("restricted from prolong [sic] standing and walking; constant and/or repetitive bending, twisting, and stooping; and lifting heavy objects). Dr. Beale again noted that his condition is permanent. (R. 225-26).

### 3. VOCATIONAL EVIDENCE

Susan Etenberg testified as the vocational expert (the "VE"). (R. 227). The hypothetical posed to VE Etenberg by ALJ Karmgard was: a 42 year old male with a tenth-grade level of education who can lift or carry 10 pounds frequently and 20 pounds on an occasional basis; the individual can sit, stand, or walk with normal breaks for up to six hours within each eight hour day; may not push or pull a weight equivalence of up to 20 pounds on more than an occasional basis or 10 pounds on a frequent basis; may not climb ladders, ropes, or scaffolds, but may otherwise climb ramps or stairs, balance, stoop, kneel, crouch, crawl, and occasionally squat; may not perform overhead work other than on an occasional basis; may not perform work that

requires repetitive twisting of the trunk or torso. (R. 262, 263).

VE Etenberg testified that the hypothetical worker could not return to any of Plaintiff's past employment as a truck driver, a roofer or a construction worker. (R. 263).

As for alternative positions, VE Etenberg testified that the hypothetical worker was suited for jobs at the unskilled light level and identified the following light exertional positions in the Detroit metropolitan area:

> 14,000 cashier jobs
> 4,000 light housekeeping positions
> 900 assemblers (light)
> 300 packers (light)

(R. 263 - 265).

She testified further that the hypothetical worker was suited for jobs at the sedentary level and identified the following sedentary exertion positions in the Detroit metropolitan area:

> 2,000 assemblers (sedentary)
> 150 packers (sedentary)
> 300 inspectors

(R. 263 - 266).

She later clarified that these sedentary jobs would allow standing for a few minutes, after 30 - 45 minutes sitting in addition to the normal job breaks (R. 266).

ALJ Karmgard then modified the hypothetical by restricting the hypothetical individual to lifting, carrying, pushing or pulling 10 pounds on an occasional basis and lighter items such as small hand tools or case files on a frequent basis; limiting standing and walking to a combined total of two hours in an eight hour day for no more than 15 minutes continuously at any one time. (R. 265, 266).

VE Etenberg testified that this modification would eliminate all light work but would not affect the ability to do the sedentary jobs identified. (R. 266).

Further modification of the hypothetical by ALJ Karmgard restricted the hypothetical individual to no overhead or shoulder level work. The VE testified that the sedentary work would not be affected by this modification but that the light jobs would be reduced by at least 50 percent. (R. 267).

Finally, ALJ Karmgard modified the hypothetical to restrict the individual's activities to no prolonged standing or walking; prohibited him from engaging in constant and/or repetitive bending, twisting, stooping and restricted any lifting of heavy objects; hypothetical individual had no capacity to sustain any lifting, carrying, sitting, standing, walking for up to six to eight hours a day, five days a week. (R. 268).

With these modifications VE Etenberg stated that there would be no work available. (R. 268).

VE Etenberg further testified that the use of a back brace would not allow an individual to perform the light work, but that the sedentary work would not be impacted. (R. 269).

### 5. THE ALJ'S DECISION

ALJ Karmgard found that the Plaintiff last met the disability insured status requirements on September 30, 2003, and that he has not engaged in any disqualifying substantial gainful activity. He found that the Plaintiff suffers from severe impairments including: "degenerative disease of the lumbar spine; obesity; history of skin cancer; history of nose fracture; and history of dislocation of the left shoulder." (R. 18).

10

These impairments did not meet the requirements or equal the level of severity contemplated under any listing included in Appendix 1 to Subpart P, Regulations No. 4.  (R. 18).

ALJ Karmgard also found the Plaintiff's complaints of disabling symptoms and limitations to lack credibility.  (R. 18).

Based on consideration of the entire record ALJ Karmgard found the Plaintiff to have medically determinable impairments that preclude the following work related activities: lifting, carrying, pushing or pulling items up to 10 pounds more than occasionally and lighter, smaller items more than frequently; standing or walking for more than two hours of an eight hour work day or for more than 15 minutes continuously; sitting with breaks for more than six hours out of an eight hour day, but instead must be allowed to change positions from sitting to standing (for one to two minutes) at intervals of 30 - 45 minutes; precluded from climbing ladders, rope or scaffolds (ramps and stairs are okay); can only occasionally balance, stoop, kneel, crouch, crawl, and squat; no repetitive twisting of the trunk or torso; no work above the shoulder level.  Thus, the Plaintiff is unable to perform his past relevant work as a truck driver, roofer, or construction worker. (R. 18 - 19).

ALJ Karmgard also found that the Plaintiff falls in the "younger" and "limited education" categories.  Using Medical-Vocational rule 201.25 as a framework for decision-making he found that even with the Plaintiff's limitations, there are still "a significant number of jobs remaining that the claimant can perform," apparently referring to the 2,450 sedentary jobs that VE Etenberg identified.  Therefore the Plaintiff is not disabled under title II of the Social Security Act.  (R. 19).

**II.    ANALYSIS**

11

**A. STANDARDS OF REVIEW**

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than their past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[1] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

---

[1] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

**B. PLAINTIFF'S CONTENTIONS & RELATED LEGAL STANDARDS:**

Plaintiff raises three challenges to the Commissioner's decision: (1) the ALJ erred by failing to find that the Commissioner of Social Security's decision denying social security disability benefits to the Plaintiff was not based upon substantial evidence; (2) the ALJ did not give proper weight to the medical opinions of the Plaintiff's treating and examining physicians; (3) the ALJ did not properly assess the Plaintiff's pain, limitations, and credibility.

A review of the record shows that there is substantial evidence to uphold the ALJ's determination only if Dr. Beale's repeated opinions as to Plaintiff's limited functional capacity and his total disability can be discounted as well as Plaintiff's statement of his symptoms upon which, in large part, Dr. Beale must be basing his opinion. Thus, the analysis of this opinion focuses on the latter two issues.

The subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain. *See Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir.1990); *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (6th Cir.1986). While the underlying condition must have an objective basis, neither the Social Security Act nor the regulations require a claimant to prove the degree of pain and limitations by objective medical evidence. Thus, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain. Section 404.1529(c)(2),[2] *see also Duncan,* 801 F.2d at 853. *Cotton v. Bowen,* 799 F.2d 1403,

---

[2] Section 404.1529(c)(2) states that a claim about the intensity of pain on the ability to work will not be rejected "solely because the available objective medical evidence does not substantiate [the claimant's] statements."

1407 (9th Cir. 1986); *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir. 1991) (*en banc*); *Benson v. Heckler,* 780 F.2d 16, 17 (8th Cir. 1985); *Halpin v. Shalala,* 999 F.2d 342, 346 (8th Cir. 1993).

*Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir. 1994), made it clear that "[t]here is no practical difference between requiring a claimant to prove pain through objective evidence and rejecting her subjective evidence because it is not corroborated by objective evidence." Nor can an ALJ merely recount the medical evidence and claimant's daily activities and then without analysis summarily concluded:

> Based upon an overall evaluation of the relevant written evidence of record as summarized above, the undersigned finds it does not contain the requisite clinical, diagnostic or laboratory findings to substantiate or form the underlying basis for claimant's testimony regarding totally disabling pain and other disabling impairments. . . .

*Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th Cir. 1994).

*Jones v. Commissioner,* 336 F.3d 469, 476 (6thCir. 2003), notes that an ALJ can reject a claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained.

> Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying. *Walters,* 127 F.3d at 528 (citations omitted). Therefore, we are limited to evaluating whether or not the ALJ's explanations for partially discrediting the Claimant are reasonable and supported by substantial evidence in the record.

Thus when the ALJ's credibility finding is adequately explained, it is entitled to deference.[3] What then constitutes a reasonable and adequate explanation? The Commissioner requires that the decisions of Administrative Law Judges

---

[3] *See also Williamson v. Secretary of HHS*, 796 F.2d 146, 150 (6th Cir. 1986); *Beavers v. Secretary*, 577 F.2d 383, 386 (6th Cir. 1978).

14

> must contain specific reasons for the [credibility findings], supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

(SSR 96-7p).

Thus, while an ALJ may find Plaintiff's allegations of severity to be not credible, the adjudicator must specifically make findings which support this conclusion. SSR 96-7p and 20 C.F.R. § 404.1529(c) set out multiple types of "non-objective" evidence the ALJ is to consider.[4] SSR 96-7p is quite specific on the type of credibility analysis that is required:

> [T]he adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. The finding on credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.

---

[4] These criterion are included in 20 C.F.R. § 404.1529(c)(3) and § 416.929(c)(3). :
  (I) The claimant's daily activities;
  (ii) The location, duration, frequency, and intensity of any pain or other symptoms;
  (iii) Precipitating and aggravating factors (*e.g.*, movement, activity, environmental conditions);
  (iv) Type, dosage, effectiveness, and adverse side-effects of    any pain medication the claimant takes or has taken to alleviate pain or other symptoms;
  (v) Treatment, other than medication claimant receives or has received to alleviate pain or other symptoms;
  (vi) Any measures claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
  (vii) Other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

(SSR 96-7p).

### C. FACTUAL ANALYSIS

In the present case, ALJ Karmgard's formal findings state: "The claimant's complaints of disabling symptoms and limitations are not considered entirely credible for the reason set forth in the body of this decision." (R. 18). Yet, those "reasons" in the decision are thin to non-existent. He seems to question certain of Plaintiff's testimony in his decision suggesting some credibility problems. He states:

> Although reporting initially an ability to raise his arms to shoulder level, he later reported an inability to elevate his arms above chest level.

(R. 13-14).

Yet, the hearing transcript seems to contradict the ALJ's account. When asked" Can you raise your arms to shoulder level?" Plaintiff did not report an ability to do so, but responded "Well, I – no, sir." ALJ Karmgard then asks "How high can you raise your arms before it's a problem?" Apparently demonstrating, Plaintiff responded

> A. "Well, probably about right here."
>
> Q. All right. I can't really – hold on. About where now?
>
> A. Probably about to my chest right here, you know because it start [sic] getting sore when I raise it up a little past that."

(R. 256).

Just before that mischaracterization of the Plaintiff's testimony, ALJ Karmgard reported Plaintiff could "stand 2-5 minutes. Because of back pain, he is unable to sit for more than about 5 minutes." (R. 13). Yet, a review of the transcript suggests these times may be more the ALJ's

16

time estimates than the Plaintiff's.[5]

Beyond this there is no credibility analysis. This credibility finding and analysis surely is not enough to satisfy SSR 96-7p nor to meet the *Jones* standard of what is needed to allow this Court to determine that the "ALJ's explanations for partially discrediting the Claimant are reasonable and supported by substantial evidence in the record."

While there was more of an explanation for discounting Dr. Beale's opinion, a sufficient explanation on that does not excuse an inadequate credibility finding regarding the Plaintiff. This is particularly so in a case such as this. Here there is objective medical evidence of an underlying medical condition explaining Plaintiff's symptoms. The question is the degree of severity of that condition as to whether it meets the second test under *Duncan*.[6] If the Plaintiff's

---

[5] Q. All right. You said that there's a problem with – even when you sit down. Realistically, how long can you sit before it becomes a problem for you?
A. Well, if I need to go outside a minute or so, I just –I just learn to deal with it. It's – you know – it's –it's so aggravating that – you know, if you – you just learn to tr to deal with it.
Q. All right. How about standing? Does that cause you a problem?
A. Yes, sir.
Q. How long do you stand up before it becomes a problem for you?
A. Just a couple of minutes, you know? You do it so you can just straighten things out.
Q. Would that also be about five minutes or so?
A. No, I think as soon as I stand up, you know, you – this thing is just like – it is like a sore thumb.
A. All right
(R. 252).

[6] *Duncan,* 801 F.2d at 853 (6th Cir. 1986), states:

> The standard does not require, however, "objective evidence of the pain itself." ... As indicated by the legislative history, our analysis under the new standard [set out in the 1984 Social Security Disability Amendments] is essentially two-pronged. . . . First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the

17

statement of his symptoms is considered credible, this would demonstrate that Plaintiff's "medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." Thus his disability claim would meet the *Duncan* standard and if his symptom testimony is credited. Acceptance of Plaintiff's credibility also would provide ample explanation and justification for Dr. Beale's opinion on Plaintiff's permanent and total disability.

*Jones v. Commissioner,* 336 F.3d 469, 477 (6thCir. 2003), notes that a treating physician's opinion is normally entitled to substantial deference, but the ALJ is not bound by that opinion. *See Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir.1987). The treating physician's opinion must be supported by sufficient medical data. *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir.1985). If the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for his rejection. *See Shelman,* 821 F.2d at 321.

Here, ALJ Karmgard repeatedly states that Dr. Beale's opinion letters and reports have conclusions not based on current "physical examination information, or are made "without further explanation," or his opinions are "not supported by the remainder of the medical record" or "by the overall record of treatment and evaluation." (R. 15-17). Other medical sources expressed contrary opinions. Dr. Bronstein thought in late 2001 that Plaintiff could return to work, though this may have been premature in light of Plaintiff's failed effort to return to a desk job. The state agency's consulting examiner, Dr. Shelby-Lane, concluded in July of 2002 that Plaintiff had a residual functional capacity consistent with medium exertional jobs. Thus, there

---

        objectively established medical condition is of such a severity that
        it can reasonably be expected to produce the alleged disabling
        pain.

18

is some evidence to justify the ALJ's finding.   Yet, this difference of opinion between Dr. Beale and  Dr. Shelby-Lane is likely based in large measure on differing assessments as to whether Plaintiff's alleged symptoms are credible in light of the clinical, diagnostic and objective evidence.  Thus, until the fact-finder has made a legally sufficient determination of the extent to which Plaintiff's statements concerning the degree of his limitations due to pain is to be credited, a fact-finder would be premature in choosing which medical opinion bearing on Plaintiff's residual functional capacity is to be accepted.

In the present case, there were not adequate credibility findings and explanations to meet the standards of either the Commissioner or of the Sixth Circuit.  Thus the decision of the Commissioner cannot be upheld.   The remaining question is whether to remand for further proceedings or for an award of benefits.  *Faucher v. Secretary of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."  This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher* citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Contrary to the argument of Plaintiff's counsel it cannot be said that Plaintiff on this record meets these requirements for an award of benefits.  Thus, this matter should be remanded for further proceedings consistent with this Opinion and Order.

In order to assure that it appears that Plaintiff is afforded a full and fair hearing on the record as a whole and such supplemental evidence as may be deemed appropriate, and not merely a "patching" of a predetermined decision, it would be appropriate that the remand

proceeding take place before a different administrative law judge.

## III.     ORDER:

For the reasons stated above, IT IS ORDERED that Defendant's Motion for Summary Judgment be DENIED and Plaintiff's Motion for Summary Judgment be GRANTED IN PART and the case remanded for further administrative proceedings consistent with this Opinion and Order.

SO ORDERED.

Dated: September 29, 2005            s/Steven D. Pepe
Ann Arbor, Michigan                  UNITED STATES MAGISTRATE JUDGE


Certificate of Service

I hereby certify that copies of this Opinion and Order were served upon the attorneys of record by electronic means or U. S. Mail on September 29, 2005.

                                     s/William J. Barkholz
                                     Courtroom Deputy Clerk